# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAI NGUYEN, | 1:10-CV-01451 LJO GSA HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| JAMES D. HARTLEY, Warden, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**RELEVANT HISTORY**[1]

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation following his conviction in San Diego County Superior Court in 1996 of forcible oral copulation with the use of a firearm. He is serving a sentence of seventeen years to life with the possibility of parole.

Petitioner does not challenge his underlying conviction; rather, he challenges the November 25, 2008, decision of the California Board of Parole Hearings ("Board") denying Petitioner parole at his initial parole consideration hearing. Petitioner claims the Board breached

---

[1] This information is taken from the pleadings and the state court documents lodged with Respondent's answer, and are not subject to dispute.

1

1  his plea agreement by failing to use a preponderance of evidence standard.  He also contends the
2  Board breached his plea agreement by keeping him incarcerated despite Petitioner reaching the
3  maximum term of his imprisonment.  He further claims the Board and California courts denied
4  Petitioner's due process rights because the determination of unsuitability for parole lacked some
5  evidence of current dangerousness.

6  Petitioner filed a habeas petition challenging the Board's 2008 decision in the San Diego
7  County Superior Court on March 24, 2009.  The petition was denied in a reasoned decision on
8  May 14, 2009.  Petitioner next filed a habeas petition in the California Court of Appeal, Fourth
9  Appellate District, on August 20, 2009.  The appellate court denied the petition on September 30,
10 2009, in a reasoned decision.  Petitioner then filed a habeas petition in the California Supreme
11 Court on December 21, 2009.  The petition was summarily denied on June 17, 2010.

12 Petitioner filed the instant federal petition for writ of habeas corpus on August 12, 2010.
13 Respondent filed an answer to the petition on November 1, 2010.  Petitioner filed a traverse on
14 November 30, 2010.  Petitioner also filed an addendum to his traverse on December 6, 2010;
15 however, the Court will not consider the declarations contained in the addendum.[2]

## STATEMENT OF FACTS[3]

17 On May 9, 1995, at approximately 8:30 p.m., two young males, Tam Houng Chau
18 ("Tam") and Loc Vu Pham ("Loc"), approached a residence at 811 Amethyst in Oceanside.  The
19 door was answered by Marlo Villena ("Marlo"), who looked through a security peephole but did
20 not open it.  Tam asked to talk with 22-year old Sheri Villena ("Sheri"), indicating that he was an
21 acquaintance of a friend of hers who lived in Santa Ana.  Sheri is the daughter of Marlo.  Tam
22 was very insistent and Sheri, who had been upstairs talking with her boyfriend on the telephone,
23 came to the front door.  In the meantime, Marlo retrieved a loaded .25-caliber semi-automatic

---

[2] Petitioner requests judicial notice of the declarations of two former Board-contracted psychologists. Respondent correctly argues that judicial notice is inappropriate when the fact to be noticed is subject to reasonable dispute. (Fed. R. Evid. § 201.)  Here, the declarations contain the opinions of the psychologists and are disputed. Additionally, it is unclear for whom the declarations were written and for what purpose.  Therefore, the Court will not take judicial notice of the declarations.

[3] This information is taken from the summary of the crime set forth in the parole decision.  See Resp't's Lodged Doc. No. 2.

from the kitchen drawer.  After Tam indicated that he had to hurry as his father was waiting for him in the car, Marlo unlocked the front door.  Tam, Loc, and four additional males rushed into the house, causing the door to strike Sheri in the head. The other males were later determined to be Petitioner, Lam Nguyen ("Lam"), Tai Truong ("Tai") and Phong Dang ("Phong").  Some of the suspects carried handguns.  Marlo and Sheri were forced under a coffee table at gunpoint. Pillows were wedged under the table, covering the victims' heads and eyes.  The suspects demanded to know where there was money and jewelry in the house as they punched and kicked at the two women.

  For the next two and three-quarter hours, Tam and his five companions, whose ages ranged from 14 to 17 years, ransacked the Villena home. They removed sodas from the refrigerator.  The soda cans, contents of drawers and closets were scattered about the residence, both upstairs and downstairs.  Tam discovered the gun in Marlo's pocket and took it away. Marlo had not fired the gun, fearing the armed suspects would have killed her daughter.  Loc and Phong found a safe and brought it downstairs.  There, they forced Marlo to open the safe.  They then tied Marlo's hands with an electrical cord and put her in the family room. One of the suspects asked her if she was expecting anyone to return home. She indicated that her husband was due back shortly as he was playing tennis at the time.  The suspects called her a liar and stated that they knew her husband only came home on weekends.  The suspects threatened to 'blow your heads off.'  Sheri was picked up by two of the suspects and taken into the pool room. There, she was placed on the floor by a roll-top desk.  The suspects took off her pants and fondled her breasts.  At one point, one suspect attempted to force her to orally copulate him.  One of the suspects began fondling Sheri and another ejaculated on her stomach.  Although the suspects continued to demand that Sheri orally copulate them, she indicated she was virgin and did not know what they wanted. (She did this hoping they would not assault her further.)  At this point in time, Lam inserted his erect penis into her vagina.  She later indicated he did not ejaculate.

  A short time later, Marlo's husband Andrew Villena ("Andrew") came home.  He later told police that he noticed a white pick-up truck in front of the house, but did not suspect

3

anything thinking it was one of Sheri's friends.  Andrew opened the garage door to his home with the automatic opener.  He entered the house through the garage entrance.  After he had taken three or four steps into the house, someone grabbed him and began beating him.  He was kicked and punched in the face.  His hands and feet were tied behind his back with an electrical cord from the vacuum cleaner.  He later reported that he was ordered, 'Don't move or we'll blow your head off.'  He was struck in the head several times with a blunt object and jabbed in the side with what he believed was a gun.  During the entire time, he was forced to keep his face hidden.  During the attack on her father, Sheri was picked up by a suspect and laid near her father.  Sheri was then taken upstairs to the master bedroom.  While upstairs, all of the suspects ordered Sheri to orally copulate them.  All but one ejaculated on her blouse. Sheri later told police that the suspects were laughing during this assault, calling each other names.  One of the suspects propped up the victim's waist with a pillow and another pulled a lamp very close to her legs.  As she thought they were going to burn her, she pulled away from them.  One of the suspects yelled that the lamp was too hot and they stopped assaulting her.  All of the suspects with the exception of Loc returned downstairs. After a short time, Loc helped Sheri downstairs and placed her next to her father.  He then tied her arms and legs with an extension cord.

   The suspects continued to ransack the house.  They removed several items of property placing them in Andrew's Dodge van.  They also took all of the keys to the cars belonging to the Villenas.  Suddenly, the suspects ran out of the house, through the back sliding glass door.  As they ran out, one of the suspects told the family members not to move or they would be killed.  The suspects drove away in Tam's Honda and in the Dodge van belonging to Andrew.  Marlo managed to free herself, running to a neighbor's house to call police.  Sheri freed herself and her father.  Together they met the police officer who had entered the home through the garage door.  San Diego police officers had been called by Sheri's boyfriend, who had been unable to reach Sheri after their initial phone call at 8:30 p.m., which had been interrupted when the defendants first came to the Villena front door.  Sheri's boyfriend had become very concerned when he could not contact Sheri for the next few hours.  He finally had called the Oceanside Police Department and asked them to check on the welfare of Sheri and her mother.  Tam was arrested

4

on June 3, 1995, along with several other suspects. He declined to make a statement. Loc did agree to talk with the police. He indicated that a cousin of the Villenas, 'Mindy,' had told Lam about the Villenas' house, indicating the occupants were rich and had a safe. 'Mindy' had given Lam the telephone number and a map of the house. Loc indicated that it was he, not Tam, who had originally spoken with Marlo, thereby gaining access to the residence.

## DISCUSSION

I.  Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging his underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

1  of the United States" or "resulted in a decision that was based on an unreasonable determination
2  of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C.
3  § 2254(d); see Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.
4      "[A] federal court may not issue the writ simply because the court concludes in its
5  independent judgment that the relevant state court decision applied clearly established federal
6  law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.
7  A federal habeas court making the "unreasonable application" inquiry should ask whether the
8  state court's application of clearly established federal law was "objectively unreasonable." Id. at
9  409.    Petitioner has the burden of establishing that the decision of the state court is contrary to
10 or involved an unreasonable application of United States Supreme Court precedent. Baylor v.
11 Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the
12 states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a
13 state court decision is objectively unreasonable.  See Clark v. Murphy, 331 F.3d 1062, 1069 (9th
14 Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).
15 II.    Review of Petition
16     There is no independent right to parole under the United States Constitution; rather, the
17 right exists and is created by the substantive state law which defines the parole scheme. Hayward
18 v. Marshall, 603 F.3d 546, 559, 561 (9th Cir. 2010) (en banc) (citing Bd. of Pardons v. Allen, 482
19 U.S. 369, 371 (1987); Pearson v. Muntz, 606 F.3d 606, 609 (2010) (citing Wilkinson v. Austin,
20 545 U.S. 209, 221 (2005)); Cooke v. Solis, 606 F.3d 1206, 1213 (2010).  "[D]espite the
21 necessarily subjective and predictive nature of the parole-release decision, state statutes may
22 create liberty interests in parole release that are entitled to protection under the Due Process
23 Clause." Bd. of Pardons v. Allen, 482 U.S. at 371.
24     In California, the Board of Parole Hearings' determination of whether an inmate is
25 suitable for parole is controlled by the following regulations:
26      (a) General. The panel shall first determine whether the life prisoner is suitable for
        release on parole. Regardless of the length of time served, a life prisoner shall be found
27      unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an
        unreasonable risk of danger to society if released from prison.
28

>       (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

Cal. Code Regs. tit. 15, §§ 2402(a) and (b). Section 2402(c) sets forth circumstances tending to demonstrate unsuitability for release. "Circumstances tending to indicate unsuitability include:

>   (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>
>       (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>       (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>       (C) The victim was abused, defiled or mutilated during or after the offense.
>       (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>       (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
>
>   (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
>
>   (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.'
>
>   (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
>
>   (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
>
>   (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

Cal. Code Regs. tit. 15, § 2402(c)(1)(A)-(E),(2)-(9).

Section 2402(d) sets forth the circumstances tending to show suitability which include:

>   (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
>
>   (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

7

> (3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.
>
> (4) Motivation for Crime.  The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.
>
> (5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.
>
> (6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.
>
> (7) Age.  The prisoner's present age reduces the probability of recidivism.
>
> (8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
>
> (9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

Cal. Code Regs. tit. 15, § 2402(d)(1)-(9)

The California parole scheme entitles the prisoner to a parole hearing and various procedural guarantees and rights before, at, and after the hearing. Cal. Penal Code § 3041.5.  If denied parole, the prisoner is entitled to subsequent hearings at intervals set by statute.  Id.  In addition, if the Board or Governor find the prisoner unsuitable for release, the prisoner is entitled to a written explanation. Cal. Penal Code §§ 3041.2, 3041.5.  The denial of parole must also be supported by "some evidence," but review of the Board's or Governor's decision is extremely deferential.  In re Rosenkrantz, 29 Cal.4th 616, 128 Cal.Rptr.3d 104, 59 P.3d 174, 210 (2002).

Because California's statutory parole scheme guarantees that prisoners will not be denied parole absent some evidence of present dangerousness, the Ninth Circuit Court of Appeals recently held California law creates a liberty interest in parole that may be enforced under the Due Process Clause.  Hayward v. Marshall, 602 F.3d at 561-563; Pearson v. Muntz, 606 F.3d 606, 608-609 (9th Cir. 2010).  Therefore, under 28 U.S.C. § 2254, this Court's ultimate determination is whether the state court's application of the some evidence rule was unreasonable or was based on an unreasonable determination of the facts in light of the evidence.  Hayward v. Marshall. 603 F.3d at 563; Pearson v. Muntz, 606 F.3d at 608.

The applicable California standard "is whether some evidence supports the *decision* of

the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." In re Lawrence, 44 Cal.4th 1181, 1212 (2008) (emphasis in original and citations omitted).  As to the circumstances of the commitment offense, the Lawrence Court concluded that

> although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

Id. at 1214.

In addition, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prison remains a danger to the public.  It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." In re Lawrence, 44 Cal.4th at 1212.

"In sum, a reviewing court must consider 'whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor.'" Cooke v. Solis, 606 F.3d 1206, 1214 (9th Cir. 2010) (emphasis in original) (citing Hayward v. Marshall, 603 F.3d at 560).

A. State Court Decision

The appellate court provided the last reasoned decision, rejecting Petitioner's claims as follows:

> Petitioner contends that he is entitled to relief on the following grounds: (1) 'the People of the State of California breached petitioner's plea agreement by failing to employ the preponderance of the evidence standard in his parole suitability hearing'; (2) because the plea agreement was breached or petitioner entered into it unknowingly and involuntarily, the plea agreement should be enforced via specific performance; (3) even applying the some evidence standard, the Board's decision fails because it is not supported by any evidence at all; and (4) the superior court's decision denying habeas relief was erroneous.

9

> Petitioner included a copy of his plea agreement which contains a provision disclosing that the maximum penalty as a result of petitioner's plea is '9 + 15 [years] to life.' Petitioner acknowledged this provision by initialing it. There is no indication that the plea agreement contains a promise to 'employ the preponderance of the evidence standard in [petitioner's] parole suitability hearing.' Likewise, there is no indication in the record that the plea agreement was breached or entered involuntarily.
>
> In examining the Board's decision, the standard of review is 'whether there exists 'some evidence' that an inmate poses a current threat to public safety, rather than merely some evidence of the existence of a statutory unsuitability factor.' [Citations.] '[W]here the record . . . contains evidence demonstrating that the inmate lacks insight into his . . . commitment offense . . . , even after rehabilitative programming tailored to addressing the issues that led to the commission of the offense, the aggravated circumstances of the crime reliably may continue to predict current dangerousness even after many years of incarceration.' [Citations.]
>
> Ample evidence supports the Board's finding. Petitioner's testimony and the psychological evaluation support the Board's determination that petitioner lacks insight into why he participated in the crime and why he sexually abused the victim. Even in the present petition, petitioner continues to demonstrate a lack of insight by challenging the Board's suggestion that petitioner participate in self-help programs involving sex offender's treatment, women's issues and relationship issues. Petitioner admits that he forced the victim to orally copulate him and acknowledges that, if paroled, he will be required to register as a sex offender, yet indicates that he is 'not quite sure why [self-help involving women's issues] is recommended.'

(See Resp't's Lodged Doc. No. 6.)

1.  Breach of Plea Bargain - Preponderance of Evidence Standard

Petitioner first alleges the State breached the terms of the plea bargain by failing to employ the preponderance of evidence standard in the parole hearing. As discussed by the state court, there is no merit to this claim. Petitioner directs the Court's attention to a copy of the plea agreement. (See Pet'r's Ex. J.) There is nothing in this plea agreement which reflects a promise that the parole hearing would employ the preponderance of the evidence standard. The claim should be rejected.

2.  Breach of Plea Bargain - Maximum Term Already Served

Petitioner next claims the plea bargain was breached since he has already served the maximum term of imprisonment. This claim is also unfounded. There is nothing in the plea agreement which would indicate a fixed term or a certain date of release. (See Pet'r's Ex. J.) According to the terms of the plea agreement which Petitioner initialed, he was sentenced to a term of "9 + 15 [years] to life." The record reflects the minimum eligible parole date was November 14, 2009, and the maximum is life. This claim is frivolous and should also be denied.

       3.      <u>Parole Suitability Determination</u>

In his remaining claims, Petitioner asserts the state courts erroneously found some evidence supported the Board's denial of parole in determining Petitioner posed an unreasonable risk of danger to the public if released. These claims are also meritless.

As set forth above, the appellate court found that some evidence supported the determination that Petitioner lacked insight into the causative factors of the commitment offense. This lack of insight was noted in the psychological evaluation in which the psychologist determined Petitioner needed more observation and treatment before he should be released. The Board agreed with the psychologist's assessment that Petitioner needed more self-help programming with respect to sex offender treatment, women's issues and relationship issues. The appellate court noted that Petitioner demonstrated his lack of insight by acknowledging that he forced the victim to orally copulate but then questioned why it was necessary that he participate in sex offender self-help programming. In addition, the evaluating psychologist concluded that Petitioner's recidivism risk was in the medium range, his overall propensity for violence was in the moderate range when compared to other inmates, and his overall risk assessment was in the moderate range. In <u>Shaputis</u>, the California Supreme Court stated that "[a]n inmate's version of the offense may indicate a lack of insight and provide a nexus between the offense and his current dangerousness." <u>In re Shaputis</u>, 44 Cal.4th 1241, 1260 (2008). Here, there is certainly some evidence of dangerousness given Petitioner's lack of insight and the psychologist's evaluation.

Although the Board also considered several positive factors indicating suitability for parole, the Board concluded that the negative aspects of Petitioner's current mental state and attitude outweighed the factors of suitability. The state courts' determination that there was some evidence to support the Board's 2008 decision is not an unreasonable application of California's some evidence standard, nor an unreasonable determination of the facts in light of the record. Accordingly, federal habeas corpus relief is unavailable.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.  The instant petition for writ of habeas corpus be DENIED; and

2.  The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **January 13, 2011**        /s/ **Gary S. Austin**
                                   UNITED STATES MAGISTRATE JUDGE